# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| **MONICA BATES,** ) | |
| ) | |
| **Claimant,** ) | |
| ) | **Civil Action No:** |
| ) | **3:15-CV-00546-KOB** |
| **v.** ) | |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On February 23, 2012, the claimant protectively filed an application under Title II for Disability Insurance Benefits, alleging disability beginning June 30, 2011 because of leg pain and a learning disability. (R. 76-81). The Commissioner denied the claimant's application at the initial and reconsideration levels, and the claimant requested a hearing.

After the June 26, 2013 hearing, an ALJ issued a decision on August 22, 2013, finding that the claimant is not disabled. (R. 10-22, 26-61). That decision became the final decision of the Commissioner when the Appeals Council denied the claimant's request for review on February 1, 2015. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

For the reasons stated below, this court reverses and remands the decision of the Commissioner because substantial evidence does not support the little weight the ALJ gave to the opinion of examining consultant Dr. Haney.

1

## II. ISSUE PRESENTED

Whether substantial evidence supports the reasons the ALJ gave for assessing little weight to the opinion of examining consultant Dr. Haney regarding the claimant's IQ score and mental limitations.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No … presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo and* will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding if substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

In deciding the weight to give a medical opinion, the ALJ should consider whether the opinion is from an examining or non-examining medical source. 20 C.F.R. § 404.1527(c)(1). An ALJ should give more weight to an examining medical source's opinion than to that of a non-examining source. *Id*. Moreover, the ALJ should give more weight to the opinion of a specialist about medical issues related to his area of specialty. *Id*. at 404.1527(c)(5).

An ALJ may reject the opinion of any physician if the evidence in the record supports a contrary conclusion. When an ALJ cites reasons for giving an examining physician little weight, and substantial evidence does not support those reasons, he commits reversible error. *See Davison v. Astrue*, 370 F. App'x 995, 997 (11th Cir. 2010) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).

## V.  FACTS

The claimant was thirty-eight years old at the time of the ALJ decision and has past work experience as a hand packager. She has not worked since June 30, 2011, when she was fired from Rudy Farms because of her attitude, slow working habits, and inability to get along with others. (R. 32-33).

School records from Zion-Benton Township High School indicate that the claimant completed the eighth grade at "Central"; completed two semesters of ninth grade at Zion-Benton with a GPA of 1.4; and completed one semester of eleventh grade at Zion-Benton with a 1.4 GPA. However, the court can find no records regarding the tenth grade or whether she passed her ninth or eleventh grade years. The school records from Zion-Benton show that the claimant

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See*, *e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

took vocational classes, in addition to "COP" Language Arts, "COP" Social Studies, "COP" Reading, and "COP" Math.[1]  (R. 168-169).

*Physical and Mental Limitations*

On February 28, 2012, Dr. Ernest L. Mollohan treated the claimant at Express Med L.L.C. walk-in clinic for mood swings and hot flashes.  She indicated that she used estrogen patches until her insurance ran out, and she could no longer afford them.  Her blood pressure was 148/102, but otherwise the examination revealed no abnormal findings.  Dr. Mollohan's clinical impressions included mood swings, diaphoresis, hypertension, fatigue, and obesity. (R. 194-195).

She returned to see Dr. Mollohan at the walk-in clinic on February 29, 2012, and discussed lab results that showed elevated cholesterol, but otherwise the results were within normal limits.  She obtained prescriptions for Lisinopril and Hydrochlorothiazide and continued taking Gabapentin and Trazodone for blood pressure and cholesterol.  (R. 197-200).

On April 19, 2012, the claimant went to the Family Health Care Clinic complaining of leg and foot pain since her hysterectomy in 2010 and swelling of her ankles.  She described feeling a pulling sensation and a tingling in the back of her legs when she sat or walked, but the physical examination was unremarkable.  The claimant also reported crying spells, moodiness, irritability, and weight gain. Nurse Practitioner NeTista Jones noted that the claimant had been on hormone replacement therapy and reported a history of learning disability and "not being very smart."  The medical assessment included depression, anxiety, insomnia, hypertension, idiopathic peripheral neuropathy, and symptomatic states associated with artificial menopause. Ms. Jones continued the prescription for Hydrochlorothiazide and Lisinopril to control the

---

[1] "COP" could denote a disability and special education acronym for "Community of Practice."  *See* http://www.parentcenterhub.org/repository/acronyms/.

claimant's blood pressure, and Progesterone for hormone replacement. She further prescribed Estradiol for hormone replacement and Amitriptyline HCI for unspecified hereditary and idiopathic peripheral neuropathy. (R. 220-223).

On April 26, 2012, Dr. John R. Haney, a licensed Psychologist, *performed a consultative psychological evaluation* of the claimant at the request of the Social Security Administration. Dr. Haney noted that the claimant's friend drove her to his office; that the claimant provided an "Alabama Non Driver Picture Identification card as photo ID"; that her mood appeared moderately agitated; and that she was "somewhat loud and seemed confused at times, which limited her cooperation." (R. 210).

Dr. Haney administered the WAIS-IV test, which revealed that the claimant has a full scale IQ score of 43, placing her in the "moderate mental retardation range of intellectual functioning." He noted that "[t]hese scores may not be a reasonably accurate estimate of the current level of intellectual functioning" because she was a "difficult individual to test due to a moderate level of agitation, and lack of emotional control." Dr. Haney stated that

> [t]he claimant was often crying, or moving about in the examining room, and talking excessively about mostly irrelevant stories. The claimant's inability to concentrate or pay attention greatly affected test performance. She required a good bit of redirection and claimed not to understand most of the test task instructions. Mental status was variable in that she responded to redirecting and seemed interested in her performance at times.

(R. 210). The claimant reported to Dr. Haney that she "attended school up to the eighth grade, attending special education classes for as many years as she could remember." (R. 210-211).

Dr. Haney described the claimant as a "poor historian" and needed a "great deal of prompting and redirection." He noted that the claimant gave the wrong date; could not subtract serial sevens but could count forward by threes using her fingers; had difficulty with simple arithmetic and change-making problems; could not abstract similarities or interpret simple

proverbs; could not name the current U.S. President; recalled zero of three objects after five minutes; and had impaired recent and remote memory. Dr. Haney indicated that her mood appeared sad; she tended to ramble; she complained of moodiness, irritability, poor memory and concentration; and she reported sleep disturbances. She did not report suicidal thoughts or attempts, and Dr. Haney reported no symptoms of psychosis. (R. 211).

Dr. Haney's diagnoses included Mood Disorder, NOS, Severe; Mild Mental Retardation (provisional); and "Consider Cognitive Disorder, NOS." He concluded that the claimant's "[a]bility to function in most jobs appeared severely impaired due to apparent emotional and intellectual limitations," and specifically indicated that "[a]ll of [the claimant's] statements were regarded as truthful although she did appear confused." (R. 209-212).

The claimant returned for a follow-up with Nurse Practitioner Jones on April 27, 2012, complaining that she had to stop taking the Estradiol because it made her sick. She continued to complain of back and leg pain, but her physical examinations were normal. Ms. Jones placed her back on Estradiol, but dropped the dosage from a two-milligram tablet per day to a 0.5-milligram tablet per day. The claimant reported that her mood swings were improving, but she still experienced irritability. (R. 224-225).

On April 27, 2012, Dr. Robert Estock, a *non-examining* state agency consultant, *reviewed* Dr. Haney's medical opinion and the claimant's records. He stated that the claimant's IQ test results "appear to conflict with actual ability to function," and noted that the claimant lived alone, cared for her child, did chores, drove, went out alone, shopped, paid her bills, managed a savings account, exercised, had visitors, talked on the phone, paid attention when necessary, and followed spoken instructions well. Dr. Estock concluded that the claimant was not significantly limited in her ability to carry out short and simple instructions; maintain a schedule; get along with coworkers and peers; and tolerate ordinary work pressures. He found that the claimant was

moderately limited in her ability to carry out detailed instructions; interact appropriately with the general public; maintain attention and concentration for extended periods; and respond appropriately to changes in the work setting. (R. 81-91).

On May 14, 2012, the claimant went to Dr. George Evans and reported hypertension, mood swings, depression, and pain in her lower back and both legs. Her blood pressure was 133/87. She said her depression had been present for several years, with symptoms of irritability, episodes of crying, feelings of guilt, mood swings, impatience, memory loss, screaming, and shaking. The claimant indicated that she recently lost a job as a result of her depression; did not like to be around people anymore; could not heel or toe walk; and had difficulty standing from a seated position. Dr. Evans described the claimant as "agitated" and "in mild distress" with a "flat affect." His impressions included lumbago, benign essential hypertension, memory loss, and leg weakness. A musculoskeletal examination revealed paraspinal muscle tenderness of the lumbar region. Dr. Evans ordered a lumbar spine MRI scan that was normal. (R. 232-237).

On referral from Dr. Evans, the claimant saw neurologist Dr. Joseph R. Cuccia on June 11, 2012. The claimant reported a four-month history of bilateral myalgias of the muscles of both legs and calves. Motor testing was normal; she had no vibratory sense in her toes, medial malleoli in both legs, and left knee; and she ambulated with a mild limp favoring the left leg. Dr. Cuccia's impression was peripheral polyneuropathy of undetermined etiology. (R 243-244).

On September 13, 2012, the claimant returned to the Family Health Care Clinic, complaining of leg pain and sleeping problems. She had gained weight since the April visit and her blood pressure was 114/78. Nurse Practitioner Jones advised the claimant to stop smoking. (R. 272).

She returned to the clinic on September 26, 2012, complaining of hot flashes and

shortness of breath around people, leg pain, and constipation.  Ms. Jones again encouraged the claimant to stop smoking, to exercise more, and to stay on a low sodium diet.  (R. 270-271).

On October 25, 2012, the claimant returned to the clinic and reported that her medications, which consisted of Hydrochlorothiazide, Lisinopril, Estradiol, Citalopram Hydrobromide, Potassium Chloride, Trazodone, and Gabapentin, were working and that she was walking more.  She denied any other problems or concerns.  She reported a history of drug and/or alcohol use, and she indicated that she continued smoking up to five cigarettes a day.  (R. 268-269).

From November of 2012 to April of 2013, the claimant saw Rosemary Snodgrasss, a Licensed Professional Counselor, at the Alpha Center seven times for counseling to help with depression.  She self-reported anger; anxiety; communication problems; depression; extended family problems; financial difficulties; grief; health problems; job loss difficulties; life change adjustment; mood swings; past verbal, emotional, and physical abuse; peer and social relationship difficulties; learning problems; sexual and intimacy concerns; sleep problems; substance use and abuse; and past suicidal thoughts.  She committed to calling Ms. Snodgrass if suicidal thoughts re-emerged.

*The ALJ Hearing*

The claimant received a hearing before an ALJ on June 26, 2013.  The claimant testified that she applied for unemployment benefits when she lost her job, and received those benefits through December 2012.  She told the unemployment compensation agency that she "could try to work but [she] was unable."  She said she called the agency on the phone each week and pressed buttons on the automated system on the phone to continue receiving unemployment. She stated that her condition had not changed from the time of receiving unemployment compensation to the time of the ALJ hearing; that she applied for unemployment to take care of

her child and stay off the streets; that her mother helped her file for unemployment benefits; and that she looked for work by placing a card in her window to notify passersby that she could clean houses, but nobody called. (R. 39-45).

The claimant testified that she lives in Section 8 housing with her six-year-old son; does not pay rent; and does not receive child support. She sometimes takes her child to school, but his father usually takes him. The claimant noted that she prepares meals for her son, dresses him with the help of her mother, and gives him asthma breathing medication. (R. 30-31).

The claimant reported that she relies on food stamps and help from her mother to get by financially. Her mother helps her pay her bills when the claimant has money to pay them, and her mother gets the money orders for the claimant's bills and takes her to pay them. The claimant picks up cigarette butts from the ground that people have discarded and smokes them, and asked the ALJ to "don't tell nobody." (R. 46-50).

The claimant noted that she washes clothes and does dishes, but her son helps with other chores, like vacuuming and wiping down the walls. She stated that she only goes to the grocery store about once a month, and her mother has to go with her to help with money and deciding what costs too much. (R. 30-35, 49-50).

The claimant did not graduate high school. She noted that she can read a limited number of words, and can only write in print. The claimant further testified that she attempted to get her GED, but was unable to pass the test. She also stated that the lady at the pizza place helped her fill out her Social Security paperwork. (R. 31-32, 49). She goes to a counselor at the Alpha Center to help her with anxiety and depression. (R. 56).

The claimant testified that she worked at Rudy Farm as an assembly line attendant, putting sausage and egg biscuits together. She was fired and re-hired continuously at Rudy Farm, but was fired permanently after June 30, 2011. She noted that she was fired because of

10

her "attitude" and her inability to get along with people. The claimant testified that she threatened an employee of Rudy Farm who called her names after being fired. (R. 32-33, 58).

The claimant said that she did not work after Rudy Farm because she had a hysterectomy that resulted in leg pain. She further noted that she takes medications for blood pressure and cholesterol, but they make her drowsy; she cannot drive all the time, but does do so on occasion and not very far; and she cannot play with her child, but she can only prop her feet up and sit while her child plays. (R. 34-36).

The claimant testified that she can stand for ten minutes; can walk about fifty yards; can sit if she props her feet up to reduce swelling in her feet; and has missed six to eight days of work a month because of her impairments. (R. 34, 37-39, 47).

The claimant indicated that the last place she looked for work was a temporary service, but the service did not inform her of any job opportunities. She stated that even though she looks after her own child, she could not work at a nursery because her nerves are too bad to be around so many children. She further noted that the noise in a nursery would make her upset. (R. 43-44).

A vocational expert, Dr. Jewell E.B. Utel, testified that the claimant's past work included a hand packer, which is a medium exertion level and unskilled job. She also testified concerning the type and availability of jobs that the claimant could perform. (R. 47-61). The ALJ asked Dr. Utel to assume a hypothetical claimant that has the same educational background as the claimant; has the same work history as the claimant; has no lifting restrictions; can understand and remember simple instructions; cannot understand or remember detailed or complex instructions; can carry out simple instructions and sustain attention to routine tasks for an eight hour workday at two hour increments; receives all customary breaks; can tolerate ordinary work pressures; should avoid quick decision making, rapid changes, and multiple demands; must work at a slow

11

pace; can maintain work consistent with the mental demands of competitive level work; can have occasional contact with the public, co-workers, and supervisors; and can adapt to infrequent and well-explained changes in the workplace. The ALJ then asked if this hypothetical individual could return to the claimant's prior work. Dr. Utel testified that person could not do her prior work, but that jobs existed in the region she could perform. Specifically, Dr. Utel stated that the claimant could work as a bottling line attendant, with 8,800 jobs nationally and 1,520 in Alabama; a booker, with 14,590 jobs nationally and 2,140 in Alabama; or a bone picker, with 608,000 jobs nationally and 7,130 in Alabama. Dr. Utel also testified that being off-task for half of the workday would preclude all work activity. (R. 52-55).

*The ALJ's Decision*

On August 22, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 22). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act. Next, the ALJ found that the claimant has not engaged in substantial gainful activity since June 30, 2011, but questioned the claimant's credibility because she received unemployment benefits while pursuing disability benefits.

The ALJ noted that Alabama law specifically precludes eligibility for unemployment benefits if the claimant is disabled, and the ALJ reasoned that receipt of unemployment benefits represents a continuing assertion of the ability to work, and, therefore, raises credibility issues. Furthermore, the ALJ found the claimant had credibility issues because no evidence showed that her condition had worsened since the unemployment benefits stopped. (R. 12-13).

Next, the ALJ found that the claimant had the severe impairments of affective mood disorder and hypertension. However, the ALJ found that the claimant did not have impairment severe enough to meet the severity of a listed impairment. Regarding her mental impairment, the ALJ found that her affective mood disorder did not meet Listing 12.04 because she only had

12

mild limitations in activities of daily living because she engages in activities of her choosing and has the capability to manage funds; mild limitations in social functioning because she interacts well with her family and can communicate with others to ensure her needs are met; and moderate limitations in concentration, persistence, and pace. The ALJ noted Dr. Haney's findings regarding the claimant's difficulty concentrating during the psychological exam, but reasoned that level of difficulty was moderate "considering the examiner's observation about [the claimant's] motivation." Regarding episodes of decompensation, the claimant has no difficulties. Therefore, the ALJ found that, because the claimant's mental impairment does not cause any "marked" limitations, the claimant's impairments do not meet Listing 12.04. (R. 13-14).

The ALJ found that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b), with the following limitations: has no lifting or exertional limitations; cannot understand detailed or complex instructions; can concentrate and maintain attention on tasks for two hour increments over an eight-hour work day; can tolerate normal work pressures; needs all customary breaks; should work at a slow pace; can have occasional contact with the public, coworkers and supervisors; and can adapt to infrequent, well-explained changes in the workplace.

In making his residual functional capacity determination, the ALJ recounted the evidence in the record, and assessed the claimant's credibility using the pain standard. He found that the claimant had evidence of several underlying conditions, including hypertension and a mood disorder, but stated that "considering the inconsistencies noted by physicians and therapists, [he] must conclude that the objective evidence does not confirm either the severity of the alleged symptoms arising from the diagnosed conditions, or that those conditions could reasonably be expected to give rise to the symptoms alleged by the claimant." Based on the

medical record and the claimant's daily activities, the ALJ found that the claimant's pain was "no more than moderate with medication." He also found, however, that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms"; however, he stated that the claimant's statements about the limiting effects of her symptoms were "not entirely credible for the reasons explained in the decision." (R. 19-20).

He also stated that the claimant had no more than mild limitations in the basic mental requirements of work, including the ability to interact with coworkers, respond appropriately to supervision, concentrate and maintain attention long enough to learn and remember work instructions, and deal with normal stress and changes in the workplace. The ALJ pointed to the fact that the claimant lives alone; cares for her child; takes him to school sometimes; and can manage funds if she has any. He also noted that the claimant drives, which indicates that she has good use of her hands; can sit; and has "the ability to maintain attention and concentration while exercising appropriate judgment." (R. 20).

The ALJ found Dr. Haney's opinion conclusory in nature because it provided little explanation of the evidence relied on in forming his opinion. The ALJ found that Dr. Haney relied heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Additionally, the ALJ found that Dr. Haney's opinion was based on a single evaluation, and on an examination in which the claimant failed to cooperate. The ALJ also indicated that the "IQ scores are invalid according to the psychologist." He gave Dr. Haney's opinion that the claimant was seriously limited in dealing with the mental demands of the workplace little weight. (R. 19-20).

In assessing Dr. Estock's consulting opinion, the ALJ found that his *non-examining* opinion was "reasonable" and "consistent with the evidence, and is more consistent with the evidence than is Dr. Haney's opinion." The ALJ noted that Dr. Estock based his opinion on the

facts that the "claimant lived alone, cared for her small child, performed chores, drove, went out alone, shopped, paid her bills, managed a savings account, exercised, had visitors, talked on the phone, could pay attention as needed, and followed spoken instructions well." (R. 20).

The ALJ found that the claimant is unable to perform her past relevant work as a hand packager with a residual functional capacity to do less than a full range of light work. However, he stated that, considering the claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that the claimant can perform. Relying on the Vocational Expert's testimony, the ALJ found that the claimant could work as a bottling line attendant, a booker, and a bone picker. Therefore, the ALJ found the claimant had not been under a disability from June 30, 2011 through August 22, 2013. (R. 21-22).

## VI. DISCUSSION

*Weight given to Dr. Haney*

The claimant argues, and this court agrees, that the ALJ lacked substantial evidence to support his decision to give little weight to Dr. Haney's opinion after examining and testing the claimant that she suffers from severe intellectual limitations. The ALJ's reasons for giving little weight to Dr. Haney's opinion and findings do not pass muster.

The ALJ stated that the claimant's full scale IQ score of 43 was "invalid" "according to the psychologist," referring to Dr. Haney who conducted the testing. However, the ALJ's conclusion that Dr. Haney found the IQ score "invalid" is different from Dr. Haney's actual statement that the claimant's score "might not be reasonably accurate." The word "invalid" indicates that the score is not at all correct, whereas a score that "might not be reasonably accurate" could indeed contain some validity. Moreover, Dr. Haney, unlike Dr. Estock, had the opportunity to observe and interact with the claimant. He noted that the claimant was difficult

15

to test because of her agitation, lack of emotion control, and inability to concentrate or pay attention. But Dr. Haney also indicated that she responded to redirection and seemed interested in her performance, and he gave no indication that he thought the claimant was intentionally malingering. In fact, Dr. Haney, despite his difficulty testing the claimant, concluded that her ability to function in most jobs would be "severely impaired" because of her intellectual limitations. Thus, when the ALJ stated that Dr. Haney said the score was "invalid," he mischaracterized Dr. Haney's opinion.

The ALJ also stated that Dr. Haney made conclusory statements based solely on the subjective complaints of the claimant. But, the ALJ again mischaracterized the evidence. The ALJ stated that Dr. Haney "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (R. 19).

The ALJ ignored the fact that Dr. Haney physically examined the claimant and made his own observations about her. Specifically, he witnessed for himself the claimant's agitation and lack of emotional control and noted the claimant was "often crying, or moving about in the examining room, and talking excessively about mostly irrelevant stories." (R. 210). He noted that her "*inability to concentrate or pay attention greatly affected test performance*" and "*she required a good bit of redirection and claimed not to understand most of the test task instructions*." (R. 210) (emphasis added). Dr. Haney further *witnessed* that her mental status was variable in that she responded to redirecting and seemed interested in her performance at times; her recent and remote memory appeared impaired; her mood appeared sad and her *conversation tended to ramble with frequent derailment;* her insight appeared poor and she may need assistance managing her own funds; and her ability to function in most jobs appeared severely impaired. (R. 210, 211). None of these observations are subjective complaints from

16

the claimant, but are personal observations made by an examining psychologist trained to identify when patients are intentionally malingering.

Furthermore, the ALJ mischaracterized the claimant's daily activities to support giving Dr. Haney's opinion little weight. (R.20). The ALJ suggested the claimant has only a "mild" or "moderate" degree of limitation in her mental functions because "she lives alone, cares for her child, takes him to school sometimes, and says she can manage funds if she has any." (R.20). He further inferred that because the claimant drives, she has the ability to maintain attention and concentration while exercising appropriate judgment. Again, the ALJ mischaracterized the evidence concerning the claimant's daily activities. The claimant does wash clothes and clean dishes, take care of her child, and pay her bills. However, she only does so *with the help* of her son, her son's father, and her mother. (R. 30-35, 49-50). The claimant's mother secures the money orders for the claimant and takes her to pay her bills. Also, the claimant indicated that she does not drive often or far; her mother drives her many places; and she had a friend drive her to the appointment with Dr. Haney. The claimant's ability to drive on occasion and perform some simple daily activities with help does not mean she does not have a severe intellectual disability.

Also, the ALJ clearly credited Dr. Estock's opinion with more weight than Dr. Haney's opinion, even though Dr. Estock did not examine the claimant. An ALJ should give more weight to an examining doctor's opinion than that of a non-examining doctor, absent some valid reason for doing so. See 20 C.F.R. § 404.1527 (c)(1). The court can find no reasonable grounds for the ALJ's conclusion that Dr. Estock's opinion was more reasonable than Dr. Haney's, especially in light of the fact that Dr. Haney personally examined and tested the claimant and Dr. Estock simply reviewed Dr. Haney's opinion and the medical records.

Finally, this court is concerned about the claimant's low IQ score. Although the IQ test score may not be completely accurate, the extremely low full scale score of 43 indicates someone with severely limited intellectual capacity, particularly considering that the claimant was in special education classes, had a limited education, attended high school sporadically, and failed the GED test. Even if the claimant's IQ score increased substantially on retesting, she may still meet a Listing under 12.05(C), given her additional mental and physical severe impairments. Therefore, on remand, the ALJ should order further IQ testing.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the ALJ's findings regarding the weight he gave Dr. Haney's opinion, and the ALJ's decision is due to be REVERSED and REMANDED.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 21st day of September, 2016.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE